COURT OF APPEALS
DECISION
DATED AND FILED

March 18, 2021

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No.    **2020AP574**

**STATE OF WISCONSIN**

Cir. Ct. No.  2018FA104

**IN COURT OF APPEALS
DISTRICT IV**

IN RE THE MARRIAGE OF:

DANIEL J. BLANK,

　PETITIONER-RESPONDENT,

　V.

MEGAN J. BALLWEG,

　RESPONDENT-APPELLANT.

APPEAL from orders of the circuit court for Grant County: CRAIG R. DAY, Judge. *Affirmed.*

Before Fitzpatrick, P.J., Kloppenburg, and Nashold, JJ.

**Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

¶1    PER CURIAM. When Daniel Blank and Megan Ballweg were divorced in 2018 they agreed to share placement of their then two-year-old daughter.[1]    Approximately one year after the divorce judgment was entered, Megan filed a motion to modify placement.    After an evidentiary hearing held shortly after Megan filed her motion, the circuit court entered an interim order temporarily modifying placement.    After a second evidentiary hearing held five months later, the court entered an order denying the motion and reinstating the placement schedule set forth in the divorce judgment.    Megan appeals, arguing that the court erroneously exercised its discretion by "misapplying" the governing statute in several respects.[2]    We reject Megan's arguments and affirm.

## BACKGROUND

¶2    The following undisputed facts are taken from the pleadings and the evidence and testimony presented at the two evidentiary hearings held on Megan's motion.    We present the facts in some detail to provide context for our analysis of Megan's arguments.

¶3    Daniel and Megan were married in October 2015, had their daughter S. in September 2016, and were divorced in September 2018.    As part of the

---

[1] The parties refer to themselves by their first names, and we follow their lead.    We will refer to their daughter and to Daniel's daughter from a previous marriage by the initials S. and O., respectively.    We will refer to O.'s mother, Meagan Pauls, by her last name.

[2] In her Notice of Appeal, Megan indicated that she was also appealing the circuit court's order requiring that she pay a portion of the guardian ad litem fees.    In her briefing before this court, Megan neither identifies the GAL order as an issue nor makes any arguments about the GAL order; she also includes in her appendix only the order and related transcript of the court's oral decision denying her motion for modification of placement, and not the GAL order. Accordingly, we deem Megan to have abandoned this part of her appeal and do not consider it. *See Post v. Schwall*, 157 Wis. 2d 652, 657, 460 N.W.2d 794 (Ct. App. 1990) ("Arguments raised but not briefed or argued are deemed abandoned by this court.").

2

divorce judgment, Daniel and Megan stipulated to shared placement of S. Daniel also shared placement of his daughter O. from a previous marriage; O. was eight years old in July 2019. Daniel and O.'s mother, Pauls, regularly communicate with each other by text, phone, and otherwise. Daniel and Megan do not communicate with each other because of a restraining order that Megan had obtained against Daniel. Megan and Pauls communicate directly with each other, and S goes to Pauls's mother's home for day care.

¶4 In July 2019, Megan filed a motion to modify placement, requesting that the circuit court "restrict Daniel's placement time in an appropriate manner until and unless Daniel has made genuine progress in treatment of his AODA [Alcohol and Other Drug Abuse] and mental health conditions."

¶5 The circuit court held a "Temporary Placement Hearing" on July 18, 2019, for the purpose, as stated by the court, of developing "some means of getting control of" the placement situation on a temporary basis until it could be resolved on a more permanent basis. Megan, Daniel, and Pauls testified at the hearing, and their testimony provided the following undisputed description of the situation that precipitated Megan's motion.

¶6 Daniel has a history of mental health issues, and for a month or so prior to June and July 2019, Megan had been increasingly concerned about Daniel's mental health and substance abuse. On June 20, 2019, Daniel was caring for S., who was then two and three-quarters years old. Daniel had been highly manic for a month prior to that date, barely sleeping, and drinking excessively to help him sleep. On June 20, 2019, as Daniel testified, he had been drinking even more and "it all came to a head." He texted Pauls, saying that he had not slept and had been drinking a lot, and asked her to come get S. Daniel testified that he

asked Pauls to come get S. because he intended to kill himself and "couldn't do it with S. there." Daniel had difficulty texting and began sending videos. One of the videos he sent showed him pointing a loaded gun at his head. Pauls contacted the police and Megan and then went to Daniel's home at about midnight at the police's request and brought S. to her home, where Megan later picked up S. to bring her to Megan's home. Megan withheld S. from placement with Daniel for the next two scheduled days following the June 20 incident. S. then resumed placement with Daniel, although Megan continued to be concerned for her safety.

¶7     Between June 20 and the July 18 hearing, Daniel saw a new doctor who prescribed certain medications for Daniel and Daniel began seeing a therapist. He still drank, but "not nearly as much," and still smoked marijuana, but not when his daughters were around. He was still depressed "to an extent," but he "got the help [he] needed" and was "doing what [he could] to be better so [he could] have [the kids]."

¶8     At the conclusion of the July 2019 hearing, the circuit court found that Daniel did the right thing by contacting Pauls on June 20 and seeking medical help, that Pauls did the right thing by calling the police and Megan and bringing S. to her home, and that Megan did the right thing by getting S. and reasonably withholding placement immediately afterwards. The court determined that it was proper to step back from the placement schedule until Daniel showed that he was where the court, the parties, and his two daughters "need[ed] him to be." The court temporarily modified placement to give Daniel time to be properly diagnosed and get proper treatment, reduced S.'s placement with Daniel to one afternoon per week, restricted Daniel's alcohol consumption and marijuana use, and required Daniel to pursue therapy and take prescribed medications. The court

clarified that the reduced placement schedule and associated restrictions were to be short-term, dependent on Daniel's getting control of his mental health.

¶9      The circuit court entered an "Interim Order" consistent with its remarks at the hearing. The court stated in the order that:

> Until progress is made by Daniel in assessing and treating the issues identified above, it is in [S.]'s best interest that his placement be modified. Such modification is intended to be temporary in nature, with Daniel's participation and progress in treatment the primary determinant of when some or all of his placement can appropriately be restored.

¶10      After a status conference in late August 2019, the circuit court entered an "Interim Order (Revised)" that slightly increased S.'s placement with Daniel to include one overnight every other week.

¶11      On December 20, 2019, the circuit court held a "Placement Hearing" at which Daniel, Megan, and Pauls testified, and at which Daniel's medical records were presented. Their testimony and the medical records provided the following undisputed description of the situation that existed at the time of the December hearing.

¶12      Daniel testified as follows. Daniel was being treated by a new medical doctor who prescribed his medication and by the psychotherapist whom he had been seeing since the June 20 incident and whom he was seeing less frequently as he improved. He was diagnosed with severe bipolar disorder and alcoholism. He was drinking much less, one six-pack of beer a week, had lost weight, and felt great. He still struggled with sleep once every couple of months and smoked marijuana at night to relax. He had been struggling with mental health issues and drinking excessively for years and had been smoking marijuana

when he was married to Megan, he had not been the best father but was going to do much better, and since June 20 his parenting was much better. He was in daily contact with Pauls.

¶13 Megan testified as follows. S. continues to return from placement with Daniel ungroomed, dirty, clingy, and upset, and says her father is mean to her and yells at her, and Megan's biggest concern is Daniel's commitment to ongoing mental health treatment and his not being treated for his alcoholism.

¶14 Pauls testified as follows. She noticed a big difference in Daniel's anxiety and demeanor since he started treatment, Daniel also occasionally cares for her son and Megan's sister's children, her son loves going to Daniel's home, and O. is never scared to go there. She was at Daniel's home a couple of days before the hearing and had no concerns, and she is happy with his progress.

¶15 The guardian ad litem recommended somewhat increased placement until February 1, 2020, and then returning to equal placement if Daniel "continues to have no issues with his mental health."

¶16 The circuit court found that Daniel's drinking, marijuana use, sleeping difficulties, and bipolar disorder were not new but existed during the marriage; that what was new was one frightening, harmful incident in response to which all of the persons involved took appropriate action, and that the situation was at least restored to what existed at the time of divorce when the parties agreed to shared placement and was "probably" better. The court concluded that under the onerous statutory standard for a modification within two years of a divorce judgment, "the only correct lawful answer on this record is to deny the motion to modify placement." The court subsequently entered an order denying the motion

to modify placement and reinstating the placement schedule set forth in the divorce judgment.

¶17    Megan appeals.

## DISCUSSION

¶18    Megan argues that the circuit court erroneously exercised its discretion by "misapplying" WIS. STAT. § 767.451(1)(a) (2019-20)[3] when it: (1) denied her motion to modify placement based on the circumstances that existed at the time of the December 2019 hearing rather than on the circumstances that existed in July 2019 when she filed her motion; (2) applied a "government hands-off" policy; and (3) incorrectly focused on changed circumstances and determined that no substantial change of circumstances had been shown.  We first state the applicable standard of review and then address each argument in turn.

### I.  Standard of Review

¶19    We review modification of a placement order to determine if the decision reflects a reasonable exercise of discretion.  We will sustain discretionary acts as long as the [circuit] court examined the relevant facts, applied a proper standard of law and, using a demonstrated rational process, reached a conclusion a reasonable judge could reach.

*Glidewell v. Glidewell*, 2015 WI App 64, ¶22, 364 Wis. 2d 588, 869 N.W.2d 796 (internal citations and quotations marks omitted).  Our task as the reviewing court is to search the record for reasons to sustain the circuit court's exercise of discretion, but when the contention is that the court erroneously exercised its

---

[3] All references to the Wisconsin Statutes are to the 2019-2020 version unless otherwise noted.

discretion because it applied the incorrect legal standard, we review that issue independently. *Hughes v. Hughes*, 223 Wis. 2d 111, 120, 588 N.W.2d 346 (1998).

## II. *Reliance on Evidence of Circumstances at December 2019 Hearing*

¶20 As stated, Megan argues that the circuit court "misapplied" WIS. STAT. § 767.451(1)(a) when it denied her motion to modify placement based on the circumstances that existed at the time of the December 2019 hearing rather than on the circumstances that existed in July 2019 when Megan filed her motion. As we explain, we conclude that the circuit court properly exercised its discretion in relying on evidence of the current custodial conditions at the December 2019 hearing and rejecting Megan's argument that additional hearings were warranted.

¶21 Megan moved to modify placement within two years of the divorce judgment pursuant to WIS. STAT. § 767.451(1)(a), which provides in pertinent part that a court may not grant a motion that seeks to substantially alter the time a parent may spend with his or her child unless the party seeking the modification "shows by substantial evidence that the modification is necessary because the current custodial conditions are physically or emotionally harmful to the best interest of the child." Sec. 767.451(1)(a).

¶22 We briefly summarize the pertinent background.

¶23 After Megan learned of the June 20, 2019, incident described above, she withheld placement for two days. Daniel responded by filing a petition to enforce the placement order on June 26, 2019. Megan resumed placement on June 28, 2019. On July 9, 2019, Megan filed a motion to modify placement, requesting that the circuit court "restrict Daniel's placement time in an appropriate manner

until and unless Daniel has made genuine progress in treatment of his AODA and mental health conditions."

¶24    The circuit court held a "Temporary Placement Hearing" on July 18, 2019, for the purpose of, as stated by the court, developing "some means of getting control of" the situation on a temporary basis until the situation could be resolved on a more permanent basis. Megan's counsel responded that getting "control of the situation in a way that is for the welfare of the children at least on an interim basis, that would be great."

¶25    Based on the testimony and evidence presented at the hearing, the circuit court found that Megan's two-day withholding of placement was reasonable and denied Daniel's petition to enforce placement. The court also temporarily reduced placement to give Daniel time to be properly diagnosed and get proper treatment and clarified that the reduced placement schedule was to be short-term, depending on Daniel's "getting control of" his mental health. The court reiterated in its "Interim Order" that:

> [u]ntil progress is made by Daniel in assessing and treating the issues identified above, it is in [S.]'s best interest that his placement be modified. Such modification is intended to be temporary in nature, with Daniel's participation and progress in treatment the primary determinant of when some or all of his placement can appropriately be restored.

After a status conference in late August 2019, the court issued a revised interim order that slightly increased placement.

¶26    On December 20, 2019, the circuit court held a "Placement Hearing," at which Megan's counsel argued that, given the seriousness of and danger presented by Daniel's bipolar disorder and his conduct in June 2019, the

9

court should at the least keep oversight of the situation by scheduling a review in 120 days, as recommended by the guardian ad litem, and, "[i]f it looks like [Daniel] is continuing to make progress, we will try to work out the next step." At the conclusion of the hearing, the court acknowledged the danger that placement with Daniel presented in June and July 2019, when Megan filed her motion and "[t]here were some interim things that needed to be addressed," but denied Megan's motion based on the circumstances existing at the time of the hearing in December, including Daniel's progress since June and July 2019 in addressing his mental health, drinking, and sleeping issues. The court concluded that those circumstances did not meet the statutory "physically or emotionally harmful" standard.

¶27    We first interpret WIS. STAT. § 767.451(1)(a) and then explain why we conclude that the circuit court did not erroneously exercise its discretion by "misapplying" the statute when it denied Megan's motion to modify placement at the conclusion of the December hearing. When interpreting a statute, our analysis begins with the statutory text. *State ex rel. Kalal v. Circuit Ct. for Dane Cnty.*, 2004 WI 58, ¶45, 271 Wis. 2d 633, 681 N.W.2d 110. We give statutory language its common, ordinary and accepted meaning. *Id.* We also interpret statutory language "in the context in which it is used; not in isolation but as part of a whole; in relation to the language of surrounding or closely-related statutes; and reasonably, to avoid absurd or unreasonable results." *Id.*, ¶46. "If this process of analysis yields a plain, clear statutory meaning, then there is no ambiguity, and the statute is applied according to this ascertainment of its meaning." *Id.* (citation omitted).

¶28    As explained, the statute states that the party seeking to modify placement within two years of the divorce judgment must "show[] by substantial

evidence that the modification is necessary because the current custodial conditions are physically or emotionally harmful to the best interest of the child." WIS. STAT. § 767.451(1)(a). The directive to "show[] by substantial evidence" that "current custodial conditions" are harmful unambiguously requires the moving party to meet his or her burden at an evidentiary hearing at which evidence of the conditions existing at the time of the hearing is presented. It would be absurd and unreasonable to construe this language as requiring the circuit court to consider only a motion's allegations of the custodial conditions and to ignore the evidence of the existing conditions presented at a hearing on the motion. The statute speaks in terms of "evidence," not "allegations," and in terms of "current," not "previous" conditions. Thus, we conclude that under the plain language of § 767.451(1)(a), the evidence presented at a hearing, not a party's filings, governs the court's modification decision.

¶29    Megan argues that it would be unreasonable for the moving party to have to allege that the conditions at some unknown time in the future, depending on the circuit court's calendar, will be harmful. This argument disregards the plain language of the statute, which as stated requires proof of current conditions, not allegations of previous conditions, and misrepresents what the circuit court did here.

¶30    The circuit court did not arbitrarily calendar the December hearing or pre-determine that the December hearing would be the "final" hearing. As shown above, the court held an initial hearing promptly after Megan filed her motion, determined that the conditions proved at the hearing were harmful but also that Daniel was taking steps to address those conditions, and determined that the situation was not amenable to a quick resolution and therefore temporary restrictions on placement and periodic revisiting of the situation were warranted

for the coming months. The court then relaxed the placement restrictions after a status conference one month later and set another evidentiary hearing four months after that. At that December 2019 hearing, Megan asked the court to continue with a temporary placement order to be reviewed yet three months later. The court implicitly rejected that request, determining that the evidence presented at that hearing proved that custodial conditions were no longer harmful so as to warrant modification, and, accordingly, denied Megan's motion.

¶31 Megan focuses her argument on the facts proven at the July hearing, asserts that those facts proved that custodial conditions were then harmful, and argues that she was not required to again prove that custodial conditions were harmful at the December hearing. The circuit court agreed that custodial conditions were harmful when she filed her motion. Megan faults the court for "delaying" the final hearing, but the record shows that the court did just what she requested in her motion—modify placement based on the harmful circumstances that existed when she filed her motion "until and unless" Daniel made "genuine progress" in addressing the issues that made those circumstances harmful at that time. Megan points to no language in the statute that prevented the court from doing just that, based on the evidence before it in July 2019, when Daniel admitted to his various issues and testified that he had begun treatment for them, and based on the evidence before it in December 2019, when Daniel showed that he had made "genuine progress" in addressing those issues. On the contrary, the circuit court did just what the statute envisions—it modified placement immediately and temporarily based on the harmful custodial conditions proven at the time Megan filed her motion and reinstated placement as scheduled in the divorce judgment based on the court's finding that, five months later, the custodial conditions were no longer harmful.

¶32    Megan attempts to couch her argument in terms of the circuit court's authority, citing *Gregory L.S. v. Gregory L.S.*, 253 Wis. 2d 563, 643 N.W.2d 890 (Ct. App. 2002) for the proposition that, in the context of a juvenile court CHIPS petition, the court's jurisdiction is determined based on the circumstances existing at the time the petition is filed. However, Megan cites no authority supporting her argument that we should apply the law that governs juvenile court proceedings to post-divorce judgment proceedings in family court. Moreover, Megan's analogy to juvenile court proceedings where, according to Megan, the court takes jurisdiction based on the circumstances stated in the petition but determines the disposition based on post-petition developments, is just what she argues should not have happened here, where the court exercised its authority to temporarily limit placement based on the circumstances proven at the time her motion was filed but determined whether to permanently modify placement based on evidence of post-motion developments.

¶33    We have ruled that, pursuant to WIS. STAT. § 767.451(1)(a), once the circuit court has determined that the placement ordered in the divorce judgment was not harmful to the child, the court "had no authority to modify the placement order" within two years of the divorce judgment. *Trost v. Trost*, 2000 WI App 222, ¶5, 239 Wis. 2d 1, 619 N.W.2d 105 (citing *Paul M.J. v. Dorene A.G.*, 181 Wis. 2d 304, 311, 510 N.W.2d 775 (Ct. App.1993). The circuit court acted consistent with that principle here.

¶34    Ultimately, Megan's argument that the circuit court "misapplied" the statute is not that the court applied the wrong legal standard, but that the court reached the wrong result based on the evidence before it at the December hearing. That is precisely a challenge to the court's exercise of discretion that we will not disturb on appeal, where, as here, the record shows that "the court examined the

relevant facts, applied a proper standard of law and, using a demonstrated rational process, reached a conclusion a reasonable judge could reach." *Glidewell*, 364 Wis. 2d 588, ¶22.

¶35 In sum, Megan's argument that the circuit court was required to consider only the conditions alleged at the time of her motion is inconsistent with the statutory language and with what she herself repeatedly asked the court to do: in her motion, at the July hearing, and at the December hearing. For the reasons explained above, her argument fails.

### III. *"Government Hands-Off" Policy*

¶36 Megan argues that the circuit court erroneously applied a "government hands-off" policy to Megan's post-divorce judgment motion. Specifically, Megan argues that the court erroneously reasoned that governmental involvement is statutorily allowed only in juvenile court proceedings, ignored that the government is involved when parties file a divorce action and that such involvement continues when the parties file post-divorce judgment motions, and improperly denied the motion instead of remaining involved in the post-divorce litigation. This argument fails because it considers the court's remarks in isolation and out of context.

¶37 The record shows that Megan's counsel first introduced the idea of governmental involvement in his argument at the December 2019 hearing, in two respects. First, he noted that a parent's alcoholism, which he suggested is less severe than the bipolar disorder suffered by Daniel here, can be a basis for the government to remove a child from the parent's home where the government establishes that the child is in need of protection or services, and that in such a

case, "when a parent suffers from alcoholism, we have conditions of six months or a year of sobriety before there's a return home to any extent."

¶38     Second, counsel stated as follows:

> One of the failings of family court, in my opinion, is that it is designed to end. It is designed to result in final orders that the parties live with for potentially years thereafter. Unlike juvenile cases where there is constant supervision, ongoing jurisdiction, anticipation of extensions or revisions and modifications. There's a temptation in family law to say here's what I see before me today, I'm going to assume that will continue indefinitely, and here's your order.

¶39     Counsel then concluded that, building on these aspects of his argument, the circuit court should at the least keep oversight of the situation by scheduling a review in 120 days, as recommended by the guardian ad litem, and, "[i]f it looks like [Daniel] is continuing to make progress, we will try to work out the next step."

¶40     At the start of its decision, the court stated:

> [Counsel's] point about the frustrations with family law is well taken. But that statutory scheme is founded in the idea that families who do not require ongoing government intervention are left to decide how to operate their families. Ongoing government intervention is only permitted if there is a finding that a child is in need of protection or services, or a juvenile in need of protection or services or adjudicated delinquent. We don't have that here.
>
> And the idea then is, as much as possible, a government hands-off. I'm the government. I am convinced that the only correct lawful answer on this record is to deny the motion to modify placement.

¶41     Megan quotes these remarks, but without the very first and the very last sentences. The first sentence establishes that the circuit court referenced the idea of governmental involvement in response to counsel's remarks and sought to

distinguish the highly intrusive step of removal of a child from a parent's home on the government's initiative from the court's role in divorce and post-divorce litigation initiated by the parties. The last sentence establishes that the court properly relied on the statutory standard here, which requires a final decision on a motion to modify placement based on "current custodial conditions" and requires that the court not step in unless those conditions are shown to be physically or emotionally harmful to the child's best interest.

¶42 The circuit court's remarks as a whole establish that the court did not shirk from its responsibility as "the government" to review the evidence presented and decide Megan's motion by applying the statutory standard—whether current custodial conditions are physically or emotionally harmful to S's best interest—to that evidence.

¶43 In sum, Megan fails to show that the circuit court erroneously applied a "government hands-off" policy here.

### IV. Changed Circumstances

¶44 Megan argues that the circuit court "improperly focused on changed circumstances" when it observed that Daniel's mental health and drinking issues at the time of the December 2019 hearing were no worse, and probably better, than they were when the divorce judgment was entered. Specifically, Megan argues that the "substantial change of circumstances" standard does not apply because her motion to modify placement was filed within two years of the divorce judgment. *See* WIS. STAT. § 767.451(1)(a) (applying to motions filed within two years of the final divorce judgment the "necessary because the current custodial conditions are physically or emotionally harmful to the best interest of the child" standard) and (b) (applying to motions filed more than two years after the final divorce judgment

the "substantial change of circumstances" standard). Her argument continues that, under the proper standard in WIS. STAT. § 767.451(1)(a), if she showed that the placement schedule was physically or emotionally harmful to S, the circuit court was required to modify placement regardless of whether or not the circumstances had changed from the time of divorce.

¶45 In the alternative, and perhaps inconsistently, Megan argues that the circuit court erroneously determined that she failed to show a substantial change of circumstances at the time when she filed her motion.

¶46 Megan bases both arguments on the undisputed facts at the time she filed her motion.

¶47 Both arguments fail for at least the following reasons. First, the circuit court did not base its decision denying Megan's motion to modify placement on either the absence of a change in circumstances or on Megan's failure to show a substantial change of circumstances. Rather, it was expressly because she failed to show that the current custodial conditions were physically or emotionally harmful to S's best interest that the court denied her motion.

¶48 As with her "government hands-off" argument, Megan relies on certain of the court's remarks in isolation and out of context. The court did state, as Megan notes, the following:

> The record is that his drinking problem precedes Ms. Ballweg, through their marriage, during their marriage, since their marriage; as does his marijuana use; as does his bipolar; as does his sleep issues. These are not new. We did have … the one very frightening incident. And the mothers took appropriate action and Mr. Blank took appropriate action. And we are now restored to as good as, and probably better than, we were on October 9 of 2018, at the divorce trial in this matter where the Court approved a stipulation of the parties for shared placement.

17

> If Mr. Blank was good enough to have shared placement then, he's good enough to have shared placement now.

The context of these remarks indicates that the court was focusing on the "restoration" of the situation with respect to Daniel's mental health, sleeping, and drinking issues, in terms of whether that situation as it existed in December 2019 was physically or emotionally harmful to S., as compared with the undeniably "harmful" situation that existed in June and July 2019. The court explained that there was the one "harmful event" on the night of June 20, 2019, but that the custodial conditions relating to Daniel's mental health, drinking and sleeping issues had improved and were "better than they have been," because the treatment Daniel sought and was still undergoing "appears at some level to be working." The court stressed how important it was that Daniel continue with his treatment so as to prevent the custodial conditions from becoming harmful, as they were in June and July 2019. The focus of the court's reasoning was on the progress Daniel had made *since June 2019*, in terms of what that progress meant as to whether the custodial conditions *in December 2019* were harmful to S.

¶49 Second, the circuit court acknowledged that Megan properly brought her motion in July 2019, when the custodial conditions were harmful for S. Thus, her arguments here amount to no more than a repackaging of her first argument that the court erroneously based its final decision denying Megan's motion on the circumstances at the time of the December 2019 hearing rather than on the circumstances when she filed her motion in June and July 2019. We have already rejected that argument above.

¶50 Before concluding, we observe that, to the extent that Megan indicates that she is raising her alternative argument now because the "substantial

change of circumstances" standard will apply if we remand insofar as more than two years have elapsed since the divorce judgment here, her argument based on the July 2019 circumstances is of no consequence because, just as the new standard would apply should she now seek to modify placement, so would there also be new evidence of whatever circumstances now exist.

## CONCLUSION

¶51 For the reasons stated above, we conclude that the circuit court properly exercised its discretion when it denied Megan's motion to modify placement.

*By the Court.*—Orders affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)5.